**BUTLER v. CHICAGO, R. I. & P. RY. CO.**
**HARRIS v. SAME.**

No. 507.

District Court, W. D. Louisiana,
Monroe Division.

Oct. 2, 1942.

Wayne Stovall, of Jonesboro, La., and Theus, Grisham, Davis & Leigh, of Monroe, La., for plaintiffs.

Barksdale & Barksdale, of Ruston, La., for defendant.

PORTERIE, District Judge.

The above two actions arose from an accident which occurred at Clay, Louisiana, in Jackson Parish, on December 20, 1940, in which accident the defendant's train struck a truck owned and occupied by Fleming Butler but which was being driven at the time by Ira Lee Harris, who was killed as a result of the collision.

Fleming Butler instituted suit for $3,350.-00, representing personal injuries, damage to his truck, etc., and Iona Harris, widow of Ira Lee Harris, instituted suit for $20,-000.00 to recover for the alleged wrongful death of her husband. The cases were brought in the state court, but were removed to this court, where they were consolidated for the purpose of trial.

The main line of defendant's railroad tracks runs north and south at and near the scene of the accident, and runs parallel with and a few feet east of U. S. Highway No. 167. At Clay, Louisiana, the defendant maintains a spur track, or side track, situated on the east side of its main track and running parallel therewith. The spur track is of sufficient length to serve for passing purposes of the longest freight trains. The road crossing where this accident happened is over both the main line and the spur track. This accommodation road starts at and is perpendicular to Highway 167, and runs east and west over the two railroad tracks, then turns southerly at a right angle, hugging the spur track to facilitate the loading of cars. The defendant's station is approximately 300 feet south of this crossing, and on the west side of the main line.

It is well to note that this short accommodation road, though public, is not a through road, but incidentally serves as a means of communication to the few inhabitants living on the farms on the south side of the railroad track.

The two men had finished unloading pulp wood off their truck into cars that had been spotted for the purpose on the spur track by the defendant.

In spotting these cars, the defendant had left one or two cars north of the road crossing and had left several cars on the spur track south of the road crossing. It was proved clearly and preponderantly at the trial of the case that there was a measured distance between the car to the north and the car to the south of 36 feet; the subdivision of this aggregate being 16 feet for the width of the road with ditches, 10 feet between the road and the north car, and 10 feet between the road and the south car.

The evidence is that while Harris and Butler were taking the pulp wood from off their truck and loading on one of defendant's railroad cars, a freight train of defendant, traveling south, arrived at Clay, and since defendant's northbound passenger train was due shortly, the freight train proceeded beyond the station house at Clay and backed on to the spur, so as to clear the main line for the passenger train. This passenger train was of the new type now used by railroads, composed of two or three cars, and not propelled by locomotive, but propelled by either a Diesel or gasoline engine; the bell and whistle arrangements on this type of train are quite different from the old-time bell and steam whistle—though the alarm given by either is admitted to be equally if not more effective than the old type of alarm. The freight train on the switch was equipped with the regular steam engine, customary bell and steam whistle. There is no evidence that the freight train entered the spur except for the purpose of getting out of the way of the passenger train; it neither coupled nor switched cars on the spur track.

Harris and Butler, after unloading their load of pulp wood, turned their truck around and, with Harris driving and Butler standing on the bed of the truck, looking forward, they proceeded to retrace their route, intending to cross the spur and main tracks and again reach the paved highway.

The topography of this whole area is distinctly flat. There is but a slight inclination—a rise of about one foot in fifteen or twenty feet, at the place of the railway embankment. However, there was a bad muddy place or hole in the road just before reaching the spur track, and for this bad spot the truck was stopped and the driver shifted his gear and proceeded to make the full crossing heedlessly, without stopping at all thereafter—and, apparently—to the satisfaction of the writer of this opinion—not looking at all for the on-coming passenger train on the main track to the left of the driver.

We do not accept the contention of plaintiffs that this was a blind crossing, as called by them. We do admit that the truck could not have been so stopped that the driver might look for a train either way on the main line without the rear end of the truck having to rest on part of the spur track. But there are no facts in the record which would show that there was any danger at all in stopping on the spur track. The freight train was absolutely quiet, not moving, and, to all appearances, was standing there waiting for the passenger train to go through.

As soon as the head of the driver of the truck reached beyond the projected line of the box car on the spur track to his left, he could have seen along the main line as far as the eye could reach. It was daylight and a clear day. The distance between the near rails of the spur track and the main line is only nine feet, but that is ample space, as proved, for the truck to have stopped, permitting the driver to have had a clear view of the main line up and down and still not have any part of his truck in a position to be struck by a train on the main line. We say this, giving consideration to the fact that the box car to the driver's left on the spur projected as much as a foot or a foot and a half beyond the line of the rail.

Moreover, the record discloses that the first two cars on the spur south of the road crossing were of the open type—just plain flat cars with the exception that at each end there is an upright wall, four or five feet in height, to keep the pulpwood logs from rolling off at the ends. The facts as proved disclosed that an approaching train could have been seen—we should not say continuously, but for most of the time—by the occupants of the truck, had they looked. But if their vision were ob-

structed, knowing of necessity that they were crossing railroad tracks, there was still the opportunity to stop, as aforedescribed, just beyond the spur track. This opportunity to stop and look was, we think, under the jurisprudence, a duty, the violation of which constitutes negligence.

The defendant company pleaded contributory negligence of Harris and Butler, and the court is of the opinion that the witnesses for the plaintiffs fully established defendant's plea. In other words, the driver of the truck drove right on through the mud hole and kept right on over both tracks, oblivious to his surroundings and in absolute disregard of all rules of safety natural to the situation or as imposed by law. La. Act No. 12 of 1924.

It is the testimony of Butler, the one riding in the back, standing on the bed of the truck, that he saw the train and had he been driving he would have had ample opportunity to have stopped the truck safely. But, though he cried out to the driver, the driver did not hear, nor did he stop or even look, and the attempted caution proved unavailing.

It is in evidence that the passenger train was going at a speed of about twenty-five or thirty miles per hour, having just left the station at Clay (about 300 feet away), where it had made its regular stop; that its equipment was adequate and in compliance with all regulations as to safety, etc.; and that both its bell and whistle had been in continuous automatic operation from the time it began to move out of Clay to and beyond the road crossing.

We have read all of the cases cited in plaintiffs' brief. The following four cases all pertain to accidents occurring at crossings, particularly town or city street crossings, in connection with *backing* trains: Holstead v. Vicksburg, S. & P. R. Co., 154 La. 1097, 98 So. 679; Aymond v. Western Union Tel. Co., 151 La. 184, 91 So. 671; Robertson v. Missouri P. R. Co., La.App., 165 So. 527; Dobrowolski v. Holloway Gravel Co., La.App., 173 So. 474. The instant case involves injury sustained by crossing ahead of a regularly due and approaching train; so these four cases, being inapplicable, have to be totally disregarded. However, one of the cases, that of Robertson v. Missouri P. R. Co., La.App., 165 So. 527, 529, contains a comparative discussion of cases which clearly supports the final holding in this case. We would refer in particular to the cases discussed therein of Aymond v. Western Union Tel. Co., supra; Pearce v. Missouri P. R. Co., La.App., 143 So. 547, 549; Noel v. New Iberia & N. R. Co., La.App., 145 So. 377, 379; Young v. Louisiana Western R. Co., 153 La. 129, 95 So. 511; and Holstead v. Vicksburg, S. & P. R. Co., supra. Finally, we quote from the Robertson case, at page 529 of 165 So., principles which, we think, deny judgment for plaintiffs in this case: "Moreover, we find running through all the cases the rule that, in order for plaintiff to be barred from recovery on account of contributory negligence for failure to stop, it must appear, first, that by stopping he could have avoided the accident; and, second, as a corollary to the first proposition, the failure to stop must be the proximate cause of the accident. See Holstead v. Vicksburg, S. & P. R. Co., 154 La. 1097, 98 So. 679."

But the plaintiffs have placed their greatest reliance on the case of Pokora v. Wabash R. Co., 292 U.S. 98, 54 S.Ct. 580, 78 L.Ed. 1149, 91 A.L.R. 1049. We quote, practically in full, the facts from this case (292 U.S. 98, 54 S.Ct. at page 580, 78 L.Ed. 1149, 91 A.L.R. at pages 1051, 1052):

"The defendant has four tracks on Tenth street, a switch track on the east, then the main track, and then two switches. Pokora, as he left the northeast corner where his truck had been stopped, looked to the north for approaching trains. He did this at a point about ten or fifteen feet east of the switch ahead of him. A string of box cars standing on the switch, about five to ten feet from the north line of Edwards street, cut off his view of the tracks beyond him to the north. At the same time he listened. There was neither bell nor whistle. Still listening, he crossed the switch, and reaching the main track was struck by a passenger train coming from the north at a speed of twenty-five to thirty miles an hour. * * * The record does not show in any conclusive way that the train was visible to Pokora while there was still time to stop. A space of eight feet lay between the west rail of the switch and the east rail of the main track, but there was an overhang of the locomotive (perhaps two and a half or three feet), as well as an overhang of the box cars, which brought the zone of danger even nearer. When the front of the truck had come within this zone, Pokora was on his seat, and so was farther back (perhaps five feet or even more), just how far we do not

know, for the defendant has omitted to make proof of the dimensions. Nice calculations are submitted in an effort to make out that there was a glimpse of the main track before the switch was fully cleared. Two feet farther back the track was visible, it is said, for about 130 or 140 feet. But the view from that position does not tell us anything of significance unless we know also the position of the train. Pokora was not protected by his glimpse of 130 feet if the train at the same moment was 150 feet away or farther. For all that appears he had no view of the main track northward, or none for a substantial distance, till the train was so near that escape had been cut off. Cf. Dobson v. St. Louis-San Francisco R. Co., 223 Mo.App. 812, 822, 10 S.W.2d 528; Turner v. Minneapolis, St. P. & S. Ste. M. R. Co., 164 Minn. 335, 341, 205 N.W. 213. * * * A jury, but not the court, might say that with faculties thus limited he should have found some other means of assuring himself of safety before venturing to cross. The crossing was a frequented highway in a populous city. Behind him was a line of other cars, making ready to follow him. To some extent, at least, there was assurance in the thought that the defendant would not run its train at such a time and place without sounding bell or whistle. Louisville & N. R. Co. v. Summers [6 Cir.], 125 F. 719, 721; * * * Illinois Rev. Stat. (1933 Ed.), c. 114, par. 84. Indeed, the statutory signals did not exhaust the defendant's duty when to its knowledge there was special danger to the traveler through obstructions on the roadbed narrowing the field of vision. Wright v. St. Louis-San Francisco R. Co., 327 Mo. 557, 566, 37 S.W.2d 591; Hires v. Atlantic City R. Co., 66 N.J.L. 30, 48 A. 1002; Cordell v. New York C. & H. R. R. Co., 70 N.Y. 119, 26 Am.Rep. 550."

The facts in the instant case are not sufficiently similar to those of the Pokora case so that the Pokora case should be controlling.

On the one hand (a) we have the dense shipping area of the city of Springfield, Illinois, as against the heart of the country out from the little station of Clay, the population of which small settlement is below fifty, and the town unincorporated; (b) there are four tracks on Tenth Street and much traffic ("but found so many trucks ahead of him that he decided to try the depot on the other side of the way."),

but only one main track and a spur in the instant case; (c) "A string of box cars standing on the switch, about five to ten feet from the north line of Edwards Street, cut off his view of the tracks beyond him to the north. At the same time he listened. There was neither bell nor whistle. Still listening, he crossed the switch, and reaching the main track was struck by a passenger train coming from the north at a speed of twenty-five to thirty miles an hour." In the instant case, there was no string of box cars which formed a solid obstruction to the driver's view and the evidence clearly preponderates on the point that the bell and whistle both were constantly in operation, within the requirements of La.Act No. 12 of 1924, which means sufficiently before, and continuously on through the very time that the engine of the passenger train was passing over the crossing.

The most significant accomplishment of the Pokora decision was its modification of the doctrine existing under the case of Baltimore & O. R. Co. v. Goodman, 275 U.S. 66, 48 S.Ct. 24, 25, 72 L.Ed. 167, 56 A.L.R. 645, contained in the following language: "In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look." (Italics supplied.) 275 U.S. 66, 70, 48 S. Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645. The Pokora case went back to the jury because "The Circuit Court of Appeals (one judge dissenting) affirmed ([7 Cir.], 66 F.2d 166), resting its judgment on the opinion of this court in Baltimore & O. R. Co. v. Goodman, 275 U.S. 66, 48 S.Ct. 24, 25, 72 L.Ed. 167, 56 A.L.R. 645 [27 N.C.C.A. 1]." 292 U.S. 98, 54 S.Ct. at page 580, 78 L.Ed. 1149, 91 A.L.R. at page 1051.

■ From 52 C.J., Verbo Railroads, § 1884(2), "Where View or Hearing Obstructed", we quote: "Where the view or hearing of a traveler approaching a railroad crossing is so obstructed that he cannot otherwise satisfy himself whether it is prudent to cross, it is his duty, where he is familiar with the crossing or aware of such facts, to stop and look or listen before going upon the tracks, * * *." We consider the case of Wyatt v. Yazoo, etc., R. Co., 13 La.App. 632, 127 So. 479, quite decisive of the instant case, both as to facts and as to the applicable law. The facts

in this case, as previously outlined, show that the truck driver failed to stop where he should have stopped. If he felt there was some obstruction to his complete and satisfactory view because of the cars on the spur on either side of the road, it was the more reason that he should have been particular and cautious; and since there was ample space to stop, and at a place where he would have been able to look both ways along the main-line track (which he failed to do), he was contributorily and continuously neglectful from the very moment that he put his engine into low gear and went heedlessly along to the point of the accident on the main line. Thus his negligence is the direct and proximate cause of the accident, the train being well equipped and in good order and not running at an excessive speed at the time, and the facts showing there was nothing it could have done or nothing it failed to do which would have avoided the accident.

■ In the Wyatt case we like the review of the facts and the conclusions drawn, so applicable in support of our holding here, from the cases of Vincent v. Morgan's L. & T. R. & S. S. Co., 48 La. Ann. 933, 20 So. 207, 55 Am.St.Rep. 287; Barnhill v. Texas & P. R. Co., 109 La. 43, 33 So. 63; Holstead v. Vicksburg, S. & P. R. Co., supra, 154 La. 1097, 98 So. 679; Aymond v. Western Union Tel. Co., et al., supra, 151 La. 184, 91 So. 671; Young v. Louisiana Western R. Co., supra, 153 La. 129, 95 So. 511. Quoting from this latter case: "The duty to stop, look, and listen must be performed at a time and place where stopping, looking and listening will be effective." 153 La. at pages 132, 133, 95 So. at page 512.

■■ It is indubitably clear that Harris, the driver of the car, whose legal representatives are instituting this suit, cannot recover because of his contributory negligence to the very time of his injury; but the question of whether or not Butler, the owner of the car and who was riding standing on the back of the truck, may recover, is to be decided in the view of the facts and the law applicable to him. The facts are that he did not stop, look or listen, any more than the driver, except at a time when he himself states that though he cried out to Harris, the driver, to look at the train which he saw, the noise of the truck in low gear prevented Harris from hearing Butler. We hold that Butler, even considered

as a guest in this case and disregarding the fact that he was the owner of the car and probably bound by the negligence of his employee, the driver Harris, cannot recover because he failed to exercise care for his own safety as the truck approached the crossing. He did give warning, as he states himself, to the driver to stop; but because of his negligence to that time in failing to look, it was too late and unavailing. The case of Louisiana & A. R. Co. v. Jackson, 5 Cir., 95 F.2d 369, of Aaron v. Martin, 188 La. 371, 177 So. 242, and of Ashy v. Missouri P. R. Co., La.App., 186 So. 395, will sustain this holding.

The two occupants of the truck, living in this country neighborhood, daily hauling pulp wood for loading at this little railroad point (by the admission of the survivor, in the record) knew of the railroad crossing and of this passenger train being due at about the time of the accident. Apparently, none of this was in their minds; this is neglect barring recovery.

The plaintiffs have failed; judgment will be signed for the defendant company in each suit.